IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 96-30579

---

GEORGIA-PACIFIC CORPORATION; ASSOCIATED PULP & PAPER MILLS; PHOENIX ASSURANCE COMPANY OF NEW YORK

Plaintiffs-Appellees

v.

M/V ANTHOS, her engines, tackle, appurtenances, etc., in rem; ARMADA ANZ PARCEL SERVICE, INC; TRAVIS SHIPPING CORP; PYRSOS MANAGING CO

Defendants-Appellants

---

Appeal from the United States District Court
for the Middle District of Louisiana
(93-CV-283-A-M2)

---

January 16, 1997

Before KING, DUHÉ, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Armada Anz Parcel Service, Travis Shipping Corp., Pyrsos Managing Co., and M/V ANTHOS (collectively "the vessel interests") appeal a judgment by the district court holding them liable for damage to printing paper transported from Baton Rouge,

---

[*] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

Louisiana to Burnie, Tasmania. Finding no error, we affirm.

## I. BACKGROUND

In February 1992, Georgia Pacific sold 3,264 reels of xerographic and offset printing paper to Associated Pulp & Paper Mills (“APPM”). The reels were transported by sea from Baton Rouge, Louisiana to Burnie, Tasmania. In preparation for the voyage, the reels were completely wrapped in wax-laminated paper and end caps.

Armada Anz Parcel Service was responsible for the reels “from place of rest in loading terminal to end of vessel’s hook at Burnie.” In other words, Armada Anz was responsible for the cargo until it was unloaded on the wharf in Burnie. The reels were inspected by surveyors in Baton Rouge, and, after the cargo was received aboard the ship, a clean bill of lading was issued, which stated that the reels had been shipped on board “in apparent good order and condition.”

The reels were unloaded in Burnie by stevedores hired by the vessel interests. The unloading process damaged many of the reels because the stevedores used mallets and wedges to separate the reels and wire slings to drag and hoist the reels from the ship to the wharf. Surveyors for both parties observed the unloading process, examined each reel, and made detailed

findings. At that time they noted what appeared to be minimal damage to about forty-nine percent of the reels. Thus, APPM's initial claim, made about six weeks after M/V ANTHOS left Burnie, was for $79,044. However, upon attempting to process the paper, APPM determined that the damage was much more extensive and increased its claim to $500,000. APPM based its claim on the amount of paper that it had to discard as unusable because of damage incurred in the transport and unloading of the reels of paper.

Georgia Pacific and APPM brought this admiralty and maritime action against M/V ANTHOS as an in rem defendant, and against Armada Anz Parcel Service, Inc., Pyrsos Managing Co., and Travis Shipping Corp. as in personam defendants. After the suit was filed, Phoenix Assurance Company, the cargo insurer, settled with APPM for $487,595.02. At that time, the complaint was amended to add Phoenix Assurance Company as a party plaintiff, proceeding as subrogee to the rights of Georgia Pacific and APPM.

After a bench trial, the court rendered findings of fact and conclusions of law holding that all of the plaintiffs were entitled to recover from all of the defendants in the amount of $463,954.56 plus interest. The court entered judgment for the plaintiffs, and the defendants filed a timely notice of appeal. Upon motion by the plaintiffs, the court amended its judgment to increase the recovery to $480,598.81 plus interest.

## II. DISCUSSION

*A. Clean Bill of Lading*

The district court concluded that the bill of lading served as prima facie evidence that the reels of paper were loaded on the Anthos in the condition described therein. We review this conclusion of law de novo, and we review the underlying fact finding described below under the clearly erroneous rule. Prudhomme v. Tenneco Oil Co., 955 F.2d 390, 392 (5th Cir.), cert. denied, 506 U.S. 826 (1992). A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).

The Carriage of Goods by Sea Act[1] ("COGSA") governs all contracts of carriage in which a bill of lading evidences a contract for carriage of goods by sea to or from ports of the United States in foreign trade. Under COGSA, the shipper establishes a prima facie case by proving that the cargo was

---

[1] 46 U.S.C. §§ 1300-1315.

loaded in an undamaged condition and unloaded in a damaged condition. Tubacex, Inc. v. M/V RISAN, 45 F.3d 951, 954 (5th Cir. 1995). As a general rule, a clean bill of lading is prima facie evidence that the carrier received the cargo in good condition. 46 U.S.C. § 1303(4); Blasser Bros., Inc. v. Northern Pan American Line, 628 F.2d 376, 381 (5th Cir. 1990).

The vessel interests argue that the bill of lading cannot serve as prima facie evidence when the damage to the goods is not readily apparent. They argue that the current case is similar to Caemint Food, Inc. v. Brasileiro, 647 F.2d 347, 353-54 (2nd Cir. 1981). In Caemint Food, the plaintiff sought to recover for expenses and lost profits incurred as a result of mold and rust damage to a portion of a shipment of canned corned beef. Id. at 349. The Second Circuit denied recovery on the grounds that, despite presenting a clean bill of lading, the plaintiff failed to bear its burden of proving that the goods were damaged while in the carrier’s custody. Id. at 356. The court held that a clean bill of lading was not prima facie evidence that the cargo was in good condition at the time of shipment because the cargo was “shipped in packages that would have prevented the carrier from observing the damaged condition had it existed when the goods were loaded.” Id. at 352. Just as the mold and rust on the cans of corned beef were not apparent from an examination of the cartons which contained the cans, so, the vessel interests assert, any prior damage to the paper was not apparent through

the outside wrappings. Because the paper was not visible through the wrappings, they argue, it is impossible to conclude with any assurance that the paper was in good condition when it was loaded on the ship.

Georgia Pacific and APPM argue that the paper was packaged in such a way that if the cargo had been damaged when it was delivered to M/V Anthos, the surveyors would have been able to observe external indications of that damage. Georgia Pacific and APPM distinguish Caemint Food by pointing out that, while an examination of the cartons did not give any indication as to the condition of the cans inside, some damage to the paper was apparent upon its arrival in Burnie; it was only the full extent of the damage which could not be determined until the paper was actually processed.

The question whether Caemint Food applies is determined by the type of damage for which recovery is sought. The district court found that the defects at issue here were not "hidden defects which would not be detected by an external inspection." This is a fact finding, protected under the clearly erroneous rule. It is not clearly erroneous. Thus, the district court correctly concluded that Caemint Food did not apply and that the clean bill of lading served as prima facie evidence that the paper was delivered to the ship in good condition.

*B. APPM Making Summaries*

The vessel interests argue that the district court erred in admitting APPM computer generated making summaries[2] which failed to satisfy the requirements of Federal Rule of Evidence 1006.[3] They objected to the admission of the making summaries on the grounds that their preparation demonstrated a lack of trustworthiness and that the underlying data had not been made available for examination. Georgia Pacific and APPM argue that the requirements for summary evidence under Rule 1006 do not apply to business records admissible under Federal Rule of Evidence 803(6).[4] United States v. Sanders, 749 F.2d 195 (5th

---

[2]APPM uses a computer to track production of paper and the amount of paper discarded during processing by recording raw data. A computer program then interprets the data. Print-outs of this information were admitted at trial.

[3]Federal Rule of Evidence 1006 provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court."

[4]Federal Rule of Evidence 803(6) provides in part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
> (6) **Records of regularly conducted activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness . . . .

Cir. 1984).

The district court has broad authority to determine the admissibility of evidence under the business records exception, and we review that discretion under an abuse of discretion standard. Capital Marine Supply, Inc. v. M/V ROLAND THOMAS, II, 719 F.2d 104, 106 (5th Cir. 1983). Computer business records are admissible if “(1) they are kept pursuant to a routine procedure designed to assure their accuracy, (2) they are created for motives that tend to assure their accuracy (*e.g.*, not including those prepared for litigation), and (3) they are not themselves mere accumulations of hearsay.” Id.

First, the supervisor of the Finishing Department testified as to how the data in the printouts was accumulated. The data in the printouts is what APPM uses in its normal business to track the progress of operations. Second, as long as the data contained in the printouts was entered into the computer “at or near the time” of the events recorded, the fact that the printouts themselves may have been prepared for litigation does not prevent them from being admissible under Rule 803(6). Sanders, 749 F.2d at 198. Third, the data is not an accumulation of hearsay. It consists of records of the amount of paper that had to be discarded as unusable during processing. Thus, the district court did not abuse its discretion in admitting the making summaries as business records.

*C. The Amount of Recovery*

The vessel interests argue that the amount of recovery awarded by the district court was based on clearly erroneous findings.  Specifically, the vessel interests assert that the district court failed to take into account damage to the reels after they were unloaded from the ship.  While it is possible that there may have been additional damage to the reels once they were in APPM’s custody, the vessel interests did not prove what amount of the damage occurred when the reels were in their custody as opposed to the damage that occurred when the reels were in APPM’s custody.  The purpose of COGSA is to place the primary responsibility for the safety of cargo on the vessel, its operators, and its owners.  Associated Metals & Minerals v. M/V ARKTIS SKY, 978 F.2d 47, 52 (2nd Cir. 1992).   Thus, once the shipper has presented a prima facie case, the carrier is liable for all of the damage to the cargo, unless the carrier can prove the amount of damage that was not caused by it.  Blasser Bros., 628 F.2d at 382.

The vessel interests also argue that the district court used the wrong percentage for the amount of offset paper that is typically discarded during processing.  The district court used the same figure for offset and xerographic paper, instead of using the higher figure for offset paper reflected in APPM’s records.  As APPM points out, however, Georgia Pacific’s offset

paper was already pre-sliced to standard sizes. When APPM processes its own offset paper, it has to slice and cut the different sizes from large rolls of paper, thus generating more discarded paper. The xerographic paper of both Georgia Pacific and APPM is sold only in one size, so less discarded paper is generated during processing. The district court applied the percentage that reflects the typical amount of xerographic paper discarded both to Georgia Pacific's xerographic paper and to its pre-sliced offset paper. The use of this percentage is not clearly erroneous.

The vessel interests contend finally that, in the absence of any proof of market value, the invoice price should have been used as a basis for recovery instead of the insured value. APPM insists, however, that invoice value plus ten percent, the insured value in this case, is a reasonable approximation of fair market value. The district court's use of the insured value as a basis for recovery is not clearly erroneous.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.